**UNITED STATES BANKRUPTCY CODE**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

IN RE
DONALD B. FLANAGAN
Debtor

Case No.:21-10472
Chapter 11, Subchapter V

**JOINT PLAN OF REORGANIZATION OF DEBTOR DONALD B. FLANAGAN, JR. AND PLAN SPONSORS BRANDON D. FLANAGAN, JAN R. FLANAGAN AND IN FORCE TECHNOLOGY, INC.**

This Plan of Reorganization is proposed by the debtor, Donald B. Flanagan (the "Debtor"), and the Plan Sponsors, Jan R. Flanagan, Brandon Flanagan and In-Force Technology, Inc. for the purpose of restructuring the Debtor's debts in accordance with Chapter 11, Subchapter V of the United States Bankruptcy Code. If you are a holder of an allowed claim against the Debtor, and your claim is impaired, you are allowed to cast a vote to accept or reject this Plan.

**ARTICLE 1**
**DEBTOR'S BACKGROUND**

1.1  **Filing of the Debtor's Chapter 11 Case**

On April 5, 2021, the Debtor filed a voluntary petition under Chapter 11, Subchapter V of the United States Bankruptcy Code.

1.2  **Description of Debtor's Business.**

The Debtor is the founder of In-Force Technologies, Inc. ("IFT") a software company in Lynnfield, Massachusetts. IFT is the proprietor of a state-of-the-art, first-alert software platform which provides real-time communication and information sharing for law enforcement agencies and first responders in the event of an active-shooter situation or other emergency. IFT's technology enables first responders of various agencies to communicate across a fully integrated network, enabling quicker responses and better information sharing among organizations. IFT's customers consist largely of school districts, police departments and hospitals.

IFT was formed as a Massachusetts limited liability company in November 2017. The Debtor's son, Brandon Flanagan, serves as IFT's president and CEO. Both the Debtor and Brandon Flanagan each own approximately 33% of the outstanding shares of IFT with the remainder held by various investors holding equity interests ranging from less than 1% up to 29%. IFT's business model is to sell software as a service ("SaaS"). Under the SaaS model,

1

IFT sells access to its software platform for an initial, up-front cost and then an annual renewal fee. As a start-up software company, IFT required substantial upfront capital for software development, hiring staff, acquiring office space and legal and financial services. In order to meet these capital needs, IFT has received capital contributions from both individual and institutional investors and has given promissory notes totaling $576,422 to the Debtor's wife, Jan Flanagan ("Mrs. Flanagan"). As is common with most start-up software companies, IFT was not profitable in its first three years of operations and was sustaining its operations primarily with invested and borrowed capital. Prior to the onset of the COVID-19 Pandemic, IFT was experiencing strong sales growth and was projected to be profitable by the end of 2021.

The onset of COVID-19 brought IFT's sales to a near immediate stop, with virtually all prospective clients cancelling their plans to purchase IFT's SaaS Platform. In response, IFT laid off much of its staff and cut expenses wherever possible. The Debtor deferred more than $72,000 in salary in 2020 in order to preserve cash.

As COVID-19 has subsided and schools and businesses have begun reopening, IFT's sales have again begun to grow and its has continued to attract new investment. In February 2021, IFT changed its corporate structure from an LLC to C- corporation, enabling it to sell more of its shares to fund its growth as it expands. IFT now expects that it will be profitable by 2022.

1.3    **Description of Debtors' Former Business.**

Prior to founding IFT in 2017, the Debtor owned and, along with Brandon Flanagan, operated Brandon COP-Sync, LLC ("BCS"). BSC was formed for the purpose of distributing software owned by a Texas entity, COPSync., Inc. ("COPsync"), pursuant to an exclusive Distribution Agreement. COPsync formerly owned a SasS platform that was functionally similar, but technologically different and inferior to IFT's current SaaS platform. BSC sold the COPSync software as an exclusive distributor of COPSync.

In or around June 2017, BCS and COPSync's relationship terminated due to a dispute over amounts due under the Distribution Agreement. As selling COPSync software under the Distribution Agreement was BCS's sole source of revenue, BCS' operations ceased upon termination of the Distribution Agreement.

In September 2017, COPSync filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Louisiana (the "COPsync Bankruptcy"). COPsync ultimately ceased operations and a trustee was appointed to liquidate COPSync's assets. On January 25, 2019, the COPsync trustee filed an adversary proceeding against the Debtor, Brandon Flanagan and BCS to recover sums owed under the Distribution Agreement. As it was no longer

operating and had no assets, BCS did not defend that action and judgment was entered against it in the amount of $731,239.75. The Debtor and Brandon Flanagan defended the claims against them, but the Louisiana Bankruptcy Court ultimately entered a judgment against them jointly and severally, after a full trial on the merits, in the lesser amount of $187,684.

In order to fund its operations, BCS sold equity interests to various investors and took out conventional bank loans, most notably an SBA backed commercial loan from Independence Bank in the original amount $1,5000,000 which the Debtor personally guaranteed. The Independence Bank loan is secured by on a mortgage on real property owned by the Debtor and Mrs. Flanagan, as tenants by the entirety, located at 16 Shasta Drive North Reading, Massachusetts (Shasta Drive") and 116 Castle Shores Road, Moultonborough, New Hampshire ("Castle Shores"). The Debtor further personally guaranteed a loan to BCS from First Electric Motor Service, Inc. (First Electric") and secured the loan with a mortgage on property located at 11 Basel Street, Moultonborough, New Hampshire ("Basel Street") which the Debtor and Mrs. Flanagan also own as tenants by the entirety.

The Debtor and Brandon Flanagan also entered into an agreement for judgment in the amount of $350,000 with an investor group (the "Investor Group") that had invested in BCS and subsequently sued the Debtor and Brandon after BCS failed to return their investment. In connection with this agreement for judgment, The Debtor gave the Investor Group a mortgage on Shasta Drive to secure its payment. The Debtor and Brandon are also guarantors of a $250,000 promissory note given by BCS to Richard Marden, which remains outstanding (the "Marden Note"). The Marden Note requires payments of interest in the amount of $1,458.00, until its maturity date in December 2023. After BCS ceased operations, the Debtor continued to make payments to Independence Bank, the Investor Group and Marden.

1.4     Events Leading to Filing of the Bankruptcy Case.

The Debtor's bankruptcy filing was necessitated by a confluence of events that left him unable to continue paying his debts. The Debtor's agreement with the Investor Group required him to make payments of approximately $14,000 each month. The Debtor made these payments until July 2020 when, due to IFT's business decline, he began taking a reduced salary and could no longer afford to pay. The Debtor made efforts to renegotiate the payment terms with the Investor Group, but negotiations were unsuccessful. After the Debtor ceased making payments, the Investor Group initiated efforts to enforce its judgment against the Debtor and Brandon Flanagan in Middlesex Superior Court.

Additionally, in January 2020, AndPlus, LLC ("AndPlus"), a software developer which IFT had hired to help produce its software platform sued IFT, the Debtor, and Brandon Flanagan to recover sums allegedly owed under the contract, which the Debtor had personally guaranteed, asserting more than $114,000 in damages, plus interest, attorney's fees and costs. The Debtor executed a personal guarantee

3

and mortgage on Shasta Drive to secure payment of IFT's obligation to AndPlus. That action was ongoing as of the date of the Petition Date.

The most significant factor leading to the bankruptcy filing was the impact of COVID-19 on IFT's business and its ability to pay the Debtor a regular salary. Having his income reduced by more than $70,000 in 2020 left the Debtor unable to pay maintain his regular monthly debt payments, leading to multiple defaults and damage to his credit, precluding his ability to access the equity in his real estate where needed to pay his debts.

## ARTICLE 2
## PLAN OF REORGANIZATION

The Bankruptcy Code requires that a Chapter 11 plan classify various claims and equity interests and describe the plan's treatment of each such class under the plan. The Plan also states whether each class of claims is impaired of unimpaired. A claim is considered to be impaired if the Plan alters the legal, equitable or contractual rights to which the Holder of such claim is otherwise entitled. If the Plan is confirmed by the Bankruptcy Court, then the holders of all claims against the Debtor as of the Petition Date are bound by the terms of such Plan, and their recovery is limited to what is provided for in the Plan, regardless of whether such holder voted or accept or reject the Plan. Only holders of Allowed Claims in classes that are impaired are allowed to vote whether to accept or reject the Plan.

### 2.1 Summary of Debtor's Plan

This Plan is a "bootstrap plan". Under the Plan, the Debtor proposes to cure defaults and maintain regular payments to the Consumer Mortgage Class and to restructure the Secured Claims in Classes 2 and 3 and pay such claims as provided in this Plan. The Plan further proposes to pay all of the Debtor's excess disposable income to holders of allowed General Unsecured Claims over a period of 60 months beginning on the Effective Date of the Plan. The Debtor does not propose to liquidate any assets under this plan with the exception of a Harley Davidson Motorcycle. Rather, the Debtor intends to pay creditors over 5 years from his future earnings. Nonetheless, as more fully set forth in Article 6 and Exhibit 1 of this Plan, creditors holding General Unsecured Claims will receive under the Plan far more than they would if the Debtor's assets were liquidated under Chapter 7 of the Code. The Plan is to be funded by; a) the Debtor's regular income earned from IFT; b) monthly contributions of $3,000 from the Debtor's son, Brandon Flanagan; c) monthly contributions of $6,830, from Mrs. Flanagan; and d) a lump-sum payment by IFT of $120,000.

## 2.2 Treatment of Allowed Administrative and Priority Claims

### 2.2.1 Non-Classification

As provided in Section 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims are not classified for the purposes of voting or receiving distributions under the Plan.

### 2.2.2 Administrative Claims

Administrative Claims include any post-petition fees and expenses allowed to professionals employed with Bankruptcy Court approval to render services to the Debtor during the Course of the Chapter 11 case. Allowed Administrative Claims shall be paid in full over a period not to exceed 12 months from later of: (a) the date the Bankruptcy Court enters an order allowing such Administrative Claim; or (9b) the Effective Date of the Plan. Any payment made, or to be made by the Debtor under this Plan on for services or for costs and expenses in or incurred connection with the case, or in connection with the Plan and incident to the case, are subject to approval of the Bankruptcy Court as reasonable.

It is anticipated that Debtor's bankruptcy counsel, Marques C. Lipton will assert an administrative claim of $20,000-$30,000 for services rendered, and expenses incurred in connection with representing the Debtor in these proceedings. Prior to filing this case, the Debtor paid Counsel a retainer of $12,000, in addition to the Chapter 11 filing fee of $1,738. As such the Debtor expects an additional $8,000-$18,000 will be payable on or after the Effective Date of the Plan.

The Subchapter V Trustee is also expected to assert an Administrative Claim for services rendered to the estate during the Court of this Chapter 11 case. The Debtor estimates the Subchapter V. Trustee's Administrative Claim will be $10,000 and $20,000.

Finally, the Debtor's CPA, Don Zidik of Stone CPAs is expected to assert an Administrative Claim of approximately $2,500 for preparation of the Debtor's 2020 state and federal income tax returns.

### 2.2.3 Priority Tax Claims

As of the date of this Plan, the Debtor has identified two Priority Tax Claims. The Town of North Reading has filed a proof of claim for unpaid pre-petition real estate taxes in the amount of $57,545.00 The Massachusetts Department of Revenue has filed a priority tax claim in the amount of $1,389.04 for 2019 income taxes and estimated claim of $8,600 for 2020 income taxes. The Internal Revenue Service has not filed a claim in this matter and the Debtor does not believe there is any amount owed to the IRS. The Debtor has not yet filed his 2020 state and federal income tax returns. However, the Debtor anticipates that his 2020 state and federal income tax returns will be filed on or before a hearing on confirmation of this Plan. The Debtor anticipates that his actual 2020 Massachusetts income tax liability will be substantially less than the amount estimated on MDOR's proof of claim once his 2020 income tax return is filed.

The Debtor will pay all Priority Tax Claims in equal monthly installments, together with any

5

statutory interest beginning on the Effective Date and ending on a date not later than April 4, 2026.

### 2.2.4 Additional Priority Claims

The Debtor is not aware of any other Priority Claims against him.

### 2.2.5 Additional Administrative Claims

The Debtor has paid all his usual and necessary post-petition expenses in the ordinary course and has not incurred any post-petition obligations that would constitute administrative claims. Any obligations incurred from and after the date of the Plan through the Confirmation Date shall be paid in the ordinary course.

## 2.3 Summary of Claims Classification and Treatment

The chart below summarizes the Plan's classifications of claims against the Debtor as of the Petition Date.

| Class No. and Description | Entitled to Vote | Treatment |
| --- | --- | --- |
| Class 1<br>Consumer Mortgage Claims | Yes | Claims will be paid in the accordance with the underlying promissory note and mortgage. Pre-petition arrears will be cured in equal monthly installments over 12 months. |
| Class 2<br>Independence Bank | Yes | The Debtor will make payments of principal and interest commencing on the Effective Date of the Plan for five years. A balloon payment for the remaining balance will be due upon the fifth anniversary of the Effective Date. |
| Class 3<br>Investors Group | Yes | The Debtor will make payments of principal and interest commencing on the Effective Date of the Plan for five years. A balloon payment for the remaining balance will be due upon the fifth anniversary of the Effective Date. |
| Class 4<br>AndPlus, LLC | Yes | AndPlus has been paid by IFT in accordance with a settlement agreement between And Plus and IFT |
| Class 5<br>First Electric Motors | Yes | First Electric shall be paid in full by Mrs. Flanagan over 10 months commencing July 2021. |
| Class 6<br>GM Financial | No | The Debtor shall continue to pay GM Financial in the ordinary course. |
| Class 7<br>Harley Davidson Credit | No | The Debtor shall sell the collateral securing Harley Davidson Credit's claim in full satisfaction of its secured claim. |

| | | |
|---|---|---|
| Class 8-General Unsecured Claims | Yes | Class 8 Claim Holders shall a pro rata share at least $212,207.77 in 20 equal quarterly installments commencing on the Effective Date of the Plan. |
| Class 9- Richard Marden | Yes | Class 9 Claim shall be paid by Brandon Flanagan in the ordinary course. |

## 2.4 Treatment of Classes of Claims

Each Class of Allowed Claims shall be treated under this Plan as follows:

**Class 1:** Class 1 consists of the claims Boston Private Bank, U.S. Bank, N.A. (serviced by PHH Mortgage Corporation) and New Residential Mortgage Loan Trust (serviced by Mr. Cooper) which are each secured by the Debtor and Mrs. Flanagan's interests in real estate, and which were incurred to purchase, refinance or improve said properties. Class 1 Claims shall be paid in accordance with the underlying promissory notes. Any pre-petition arrears will be paid in 12 equal monthly installments commencing on the Effective Date of the Plan. Class 1 creditors shall retain the liens securing their claims until such claims are paid in full in accordance with the underlying contracts. This class is impaired.

**Class 2:** Class 2 consists of the claim of Independence Bank whose claim is secured by mortgages on Shasta Drive and Castle Shores Road. Independence Bank shall be paid the full amount of its allowed claim in monthly installments of principal and interest over 60 months commencing on the Effective Date of the Plan. Monthly payments shall be based on a 15-year amortization schedule with interest accruing at an annual rate of 4.75%. Based upon Independence Bank's timely filed proof of claim in the amount of $984,353.52, and without waiving any rights to object to the amount of the Claim, the Debtor estimates the monthly payments to Independence Bank will be $7,656.62. A balloon payment of any unpaid balance will be due on the 60-month anniversary of the Effective Date of the Plan. Independence Bank shall retain its lien on the Debtor's property until paid in full in accordance with this Plan. Upon completion of payments under this Plan, Independence Bank's mortgages on Shasta Drive and Castle Shores shall be deemed satisfied and the Independence Bank shall execute a discharge of mortgage suitable for recording in the Middlesex Registry of Deeds. This Class is impaired.

**Class 3:** Class 3 consists of secured claim of the Investor Group which is secured by a mortgage on Shasta Drive. The Investor Group shall be paid the full amount of their allowed claim in

monthly installments of principal and interest over 60 months commencing on the Effective Date of the Plan. Monthly payments shall be based on a 15-year amortization schedule with interest accruing at an annual rate of 4.75%. Based on the Investors Group's timely filed proof of claim in the amount of $290,859.06, and without waiving any rights to object to the amount of the Claim, the Debtor estimates the monthly payments to the Investors Group will be $2,262.39. A balloon payment of any unpaid balance will be due on the 60-month anniversary of the Effective Date of the Plan. The Investor Group shall retain its lien on the Debtor's property until paid in full in accordance with this Plan. Upon completion of payments under this Plan, the Investor Group's mortgage on Shasta Drive shall be deemed satisfied and the Investor Group shall execute a discharge of mortgage suitable for recording in the Middlesex Registry of Deeds. This Class is impaired.

**Class 4.** Class 4 consists of the Claim of AndPlus, LLC ("AndPlus"). AndPlus has asserted a secured claim in the amount of $114,011.28 and a general unsecured claim in the amount of $48,416.61. On June 11, 2021, And Plus, IFT, Brandon Flanagan, Rachel Flanagan, Jan Flanagan and the Debtor entered into a settlement agreement (the "AndPlus Settlement") providing for IFT to pay AndPlus the sum of $120,000 on or before June 15, 2021. The AndPlus Settlement provides that the Debtor shall be released from this claim on the 91st day following payment by IFT, provided none of the other parties to the agreement file a voluntary or involuntary bankruptcy in that time. IFT paid AndPlus as provided in the AndPlus Settlement on June 11, 2021. No further payments will be made by the Debtor on account of the AndPlus Claim provided the terms and conditions of the AndPlus Settlement are satisfied. Upon satisfaction of the terms and conditions of the AndPlus settlement, AndPlus shall provide the Debtor a discharge of its mortgage on Shasta Drive upon satisfaction of the conditions of the AndPlus Settlement and the Debtor shall be released from all further liability for any claims to AndPlus. This Class is impaired.

**Class 5.** Class 5 consists of the Secured Claim of First Electric which is secured by a mortgage on Basel Street. First Electric's claim shall be paid by Mrs. Flanagan in accordance with the Stipulation filed with the Court on June 24, 2021. The Stipulation provides that Mrs. Flanagan shall pay First Electric's Secured Claim by making an initial payment of $25,000 followed by 10 monthly payments of $12,500. First Electric shall retain its lien on Basel Street until the payments provided by the Stipulation are completed. Upon completion of the payments by Mrs. Flanagan, First Electric will execute a discharge of its mortgage on Basel Street. This Class is

impaired.

**Class 6.** Class 6 consists of the claim of GM Financial, which is secured by the Debtor's interest in a 2017 Cadillac Escalade. The Debtor will continue to make the regular monthly payments of $513.30 in accordance with the underlying contract. This claim is scheduled to be paid in full by August 2024. This class is unimpaired.

**Class 7.** Class 7 consists of the claim of Harley Davidson Credit in the amount of $6,269.00 which is secured by the Debtor's interest in a 2009 Harley Davidson Soft Tail Deluxe (the "Harley"). The Debtor believes the Harley has little to no equity. The Debtor will sell the Harley for a price exceeding the amount of Harley Davidson's Secured Claim and shall pay the proceeds up to $6,269 to Harley Davidson in full satisfaction of its Secured Claim. Any proceeds from the sale of the Harley in excess of Harley Davidson's Secured Claim shall be paid pro rata to General Unsecured Creditors, up to 100% of allowed claims. Entry of the Confirmation Order shall constitute all necessary authority for the Debtor to sell the Harley without further notice or hearing. In the event the Debtor is unable to sell the Harley at a price sufficient to pay Harley Davidson's secured claim in full, then the Debtor will surrender it to Harley Davidson in full satisfaction of its secured claim and Harley Davidson shall be allowed a general unsecured claim for any deficiency. This Class is unimpaired.

**Class 8** - Class 8 consists of general Unsecured Claim holders. Class 8 Claim Holders shall receive their pro rata share of no less than $212,207.77 in 20 equal quarterly installments commencing on the Effective Date. Based upon the general Unsecured Claims asserted totaling $943,447.52, Class 8 Claim Holders are projected to receive approximately 22% of their claims as presently asserted. However, the Debtor's largest general unsecured creditor, VentureSpire, LLC has asserted a claim (the "Venture Spire Claim") in the amount of $918,923.75. The Debtor has filed an objection to the Venture Spire Claim asserting that it is no more than $187,648, representing the amount of the judgment entered against him by the Louisiana Bankruptcy Court. In the event the Debtor's objection to the Venture Spire Claim is sustained, the dividend to general unsecured creditors will be approximately 100%. This Class is impaired.

**Class 9** Class 9 consists of the unsecured claim of Marden in the amount of $250,000. The Marden Note requires payment of interest only in the amount of $1,458 each month until December 2023. Brandon Flanagan shall continue to make regular payments in accordance with

9

the Marden Note and will pay the claim upon maturity. The Debtor shall be released from liability on this Claim upon entry of the Confirmation Order. This Class is impaired.

2.5 **Claims Objections.** The Debtor may object to the amount or validity of any Claim by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim on or before the Claims Objection Date, which is the date that is sixty days from the latter of: a) the Confirmation Date; or b) with respect to a Claim for which a creditor is allowed to file a proof of Claim after the Bar Date, thirty days after the date on which such claim is filed. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

2.6 **Cramdown.** In the event that any class allowed to vote is deemed impaired and refuses to accept the terms of the Plan, the Debtor intends to move the Bankruptcy Court to confirm the Plan pursuant to § 1191(b) of the Bankruptcy Code. All allowed claims shall be satisfied solely in accordance with this Plan.

2.7 **Executory Contracts and Unexpired Leases.** As of the Petition Date, the Debtor was a party to only one executory contract or unexpired lease; an employment agreement between himself and IFT providing for a salary of $240,000 annually, plus potential bonuses and other benefits over a five year period commencing January 6, 2018. The Debtor intends to assume his employment agreement with IFT

2.8 **Funding of the Plan.** The Plan will be funded by a combination of; a) the Debtor's future income earned from IFT; b) a monthly contribution of $3,000 from Brandon Flanagan and c) a monthly contribution of $6,830 from Mrs. Flanagan and the lump-sum contribution of $120,000 made by IFT to AndPlus.

2.9 **Plan Sponsorship.** Brandon Flanagan, and Mrs. Flanagan are sponsoring this Plan in part by making monthly cash contributions of no less than $3,000 and $6,830 respectively. In addition, Mrs. Flanagan is making payments to First Electric in accordance with the Stipulation and IFT has contributed $120,000 to satisfy the claim of AndPlus. Payments made by the Plan Sponsors shall not be considered loans to the Debtor and the Debtor shall have no obligation to repay any portion of the Plan Sponsors' contributions to the Plan. Any payments made, or to be made by the Plan Sponsors in connection with this Plan shall not constitute Administrative Claims against the bankruptcy estate. The Plan Sponsors'

10

contributions to this Plan are made in recognition of the fact that they are jointly and severally liable for certain Claims against the Debtor and in consideration of the Injunction provided for in Article 4 below.

## ARTICLE 3
## IMPLEMENTATION OF THE PLAN

3.1  **Vesting of Property.**  Upon confirmation of the Plan, all property of the estate will revert to the Debtor, free and clear of all liens, claims and encumbrances, except as provided for in this Plan.

3.2.  **Post-confirmation Management.**  The Debtor is an individual and there are no officers, directors or voting trustees expected to serve the Debtor in any capacity. The Debtor will manage his own affairs post-confirmation.

3.3.  **Tax Consequences of the Plan.**  Creditors concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys and/or advisors.

3.4  **Distribution of Plan Payments.**  The Debtor's undersigned Counsel shall the Distribution Agent with respect to Administrative and Class 8 Claims. The Debtor will be the Distribution Agent with respect to payments to the Unsecured Priority Tax Claims and Classes 1, 2, 3, and 7. Mrs. Flanagan shall make distributions to Class 5.

3.5  **Manner of Distribution.**  Distributions of under the Plan may be made in either cash, check drawn on a domestic bank, ACH, or by wire transfer in United States Currency. The Distribution Agent shall have the sole discretion to determine the method of payment to creditors.

3.6  **Delivery of Distributions.**  Distributions to Holders of Allowed claim shall be made at: (i)the address set forth in the proofs of claim filed by such Holders (ii) at the address set forth in any written notices of address change delivered to the Debtor after the date of any related proof of claim; or (iii) at the addresses reflected in the schedules filed by the Debtor if no proof of claim has been filed and the Debtor has not received a written notices of a change of address.

3.7  **Undeliverable Distributions.**  If payment made to any Holder of an Allowed claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Debtor shall file with the Bankruptcy Court, the name, if known, and last known address of the Holder and the reason for his inability to make payments. If, after the passage of 90 days, the payment or distribution to the holder

shall be distributed to the Holders in the appropriate class or Classes on a pro rata basis, and the Allowed Claim shall be deemed satisfied to the same extent as if payment had been made to the holder of the Allowed Claim.

**3.8** **Time Bar to Cash Payments.** Checks issued by the Distribution Agent in respect of distributions to Holders of Allowed Claims pursuant to this Plan will be null and void if not cashed within 120 days of the date of their issuance. Requests for reissuance of any check shall be made to the Distribution Agent by the Holder of the Allowed Claim. Any Claim in respect of such voided check must be made on or before 180 days after the date such check was issued. After 180 days, all Claims in respect of void checks shall be discharged and forever barred and the funds, including any interest thereon, shall be treated become property of the Debtor.

**3.9** **Post Confirmation Actions.** After the Confirmation Date, the Debtor will serve the United States Trustee with a monthly operating report through the end of the month in which the Plan is confirmed. Within seven days following Effective Date of the Plan, the Debtor will file and serve on all creditors and interested parties a Notice of Occurrence of Effective Date indicating whether the payments required on the Effective Date were made or, in the event they were not made, explaining the reason(s) such payments were not made, any estimates as to when they will be made and any other relevant information pertaining to the execution of the Plan.

## ARTICLE 4
## DISCHARGE AND INJUNCTION

**4.1** **Discharge.** If the Plan is confirmed under § 1191(a), on the Confirmation Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code. If, however, the Plan is confirmed pursuant to § 1191(b) then, as soon as practicable after completion of payments under the Plan, the Court shall grant the Debtor a discharge of all debts and claims as provided in § 1141(b)(1)(A) and all other debts and Claims allowed under § 503(b), unless the Court has approved a written waiver of discharge executed by the Debtor after the Petition Date. The Debtor does not intend to execute any waiver of discharge and shall file a motion for entry of discharge when appropriate.

**4.2** **Injunction.** Except as otherwise provided for in this Plan or the Confirmation Order, Confirmation of this Plan shall enjoin all persons and entities who have held, currently hold, or may hold Claims against the Debtor, the Debtor's assets or the Estate that arose prior to the Petition Date from (i)

commencing or continuing in any manner, directly or indirectly, any action, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against the Debtor or any assets of the Debtor or the Estate (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against the Debtor or any of his assets or assets of the estate (iii) creating or perfecting or enforcing, directly or indirectly, any Lien of any kind against the Debtor or any of his assets; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligations due to the Debtor or any assets of the Debtor; and (v) acting, in any manner, in any place, that does not conform to, comply with, or is inconsistent with any provisions of this Plan.  Any person or entity injured by any willful violation of such injunction shall be entitled to recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recovery punitive damages from the willful violator.  Nothing contained herein shall prohibit a holder of a Disputed Claim from litigating in the Bankruptcy Court to have its Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan or enjoin or prohibit the interpretation or enforcement by the holder of such Disputed Claim of any of the obligations of the Debtor under this Plan.

      **4.3 Injunction as to Plan Sponsors.**  Except as otherwise provided for in this Plan or the Confirmation Order, Confirmation of this Plan shall enjoin all persons and entities who held Claims, as of the Petition Date, for which the Debtor and Plan Sponsors are jointly and severally liable from (recovering in any manner, directly or indirectly, any judgment, award, decree, or order against the Plan Sponsors (ii) enforcing, attached, executing, collecting or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against the Plan Sponsors (iii) creating, perfecting or enforcing, directly or indirectly, any lien of any kind against the Plan Sponsors or any of their assets; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligations due to the Plan Sponsors, or their assets, and (v) acting in any manner, in any place, that does not conform to, comply with, or is inconsistent with any provisions of this Plan.  Confirmation of the Plan does not in any way discharge the Plan Sponsors with respect to any obligation treated under the Plan. Any person or entity injured by any willful violation of such injunction shall be entitled to recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recovery punitive damages from the willful violator. Nothing contained herein shall prohibit a holder of a Disputed Claim from litigating in the Bankruptcy Court to have its Disputed Claim declared an Allowed Claims and paid in accordance with the distribution provisions of this Plan or enjoin or prohibit the interpretation or enforcement by the holder of such Disputed Claim of any of the obligations of the Debtor under this Plan.

**4.4 Defaults and Remedies.** In the event any party claims that the Debtor is in default of any obligation under the terms of the Plan, including any claim that the Debtor failed to make any payment required by the terms of the Plan, such part shall provide the Debtor with written notice setting forth, in specific terms, the alleged default. No default shall be deemed to exist under the Plan until such time as the written notice has been provided and the Debtor has failed to either respond with an explanation as to why no default or cured the default within 15 business days of receiving the written notice. Upon the occurrence of an event of default relating to a failure to make a payment under the Plan, the Debtor shall have the right to cure such default within 30 days by either (a) cure the default with cash payments (b) if such payment relates to a claim secured by a lien, surrender the collateral securing the lien or (c) file a motion seeking modification pursuant to 11 U.S.C.§ 1193. In the event the Debtor elects to file a motion to modify the plan and the motion is denied, the Debtor shall have 15 business days from denial of such motion to cure the default. In the event the Debtor fails to cure the default within the applicable 15-day period, any affected creditor may file a motion seeking relief from the injunctions provided herein to pursue any claims arising from a default under this Plan.

**4.5 Exculpation.** Neither the Debtor, the Subchapter V Trustee, nor any of their respective attorneys, consultants, advisors and agents (acting in such capacity), shall have or incur any liability to any entity for any act taken or omitted to be taken in relation to this Chapter 11 Case, including in the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan, provided however that the provisions of this section shall not affect the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. Any of the forgoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## ARTICLE 5
## FEASIBILITY

**5.1 Feasibility Standard.** The Bankruptcy Code requires as a condition to Confirmation that the Bankruptcy Court find that liquidation of the Debtor or the need for further reorganization is not likely to follow after Confirmation.

**5.2 Ability to Initially fund Plan.** The Debtor expects to have no less than $10,000 on hand by the Effective Date of the Plan to make initial payments under the Plan.

**5.3 Ability to Make Ongoing Plan Payments.** The Debtor intends to fund this Plan with his

future earnings from IFT, along with monthly contributions from the Plan Sponsors. Pursuant to his employment agreement with IFT, the Debtor is entitled to receive an annual salary of $240,000, plus semi-annual bonuses of up to $50,000 each. The Debtor has not historically received bonuses due to IFT's need to preserve cash to fund its operations. However, the Debtor conservatively estimates that he will begin receiving semi-annual bonuses of no less than $25,000 beginning in December 2021. The Plan is to be further funded by contributions from Mrs. Flanagan in the form of (a) her monthly social security income of $1,130; and (b) monthly interest payments of $5,700 from IFT on account of accrued interest on promissory notes IFT has given her totaling $576,422.46. Attached hereto as Exhibit 2 is the Debtor's Summary of Post-Petition Operations and Statement of Financial Projections reflecting the Debtor's proposed budget for the five-year period commencing on the Effective Date of the Plan. As shown in the Statement of Financial Projections, the Debtor will have adequate income to make the payments required under the Plan.

## ARTICLE 6
## LIQUIDATION ANALYSIS

The Bankruptcy Code also requires as a condition of confirmation of the Plan that, with respect to each Impaired Class, such class either (a) accept the plan, or b) will receive or retain under the plan not less than amount such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Code.

To calculate what creditors would receive if the Debtor were to be liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Chapter 11 case were converted to a Chapter 7 case under the Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value"). The Liquidation Value is the net proceeds available to unsecured creditors from the liquidation of the Debtor's assets, based upon the estimated values of the Debtor's assets, the claims securing such assets, and the anticipated administrative costs of liquidation in a hypothetical Chapter 7 case. Attached hereto as Exhibit 3 is Debtor's analysis of what unsecured creditors would receive if this case were converted under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis reflects that no more than $118,602.10 would be available to pay general unsecured claims in a Chapter 7 Liquidation analysis, approximately 13% of asserted claims.

The Liquidation Analysis assumes that a hypothetical Chapter 7 Trustee would be permitted to sell the Debtor and Mrs. Flanagan's tenancy by the entirrety interest in Castle

Shores and Basel Street pursuant to 11 U.S.C. § 363(h). Pursuant to § 363(h), a trustee may sell both a debtor and non-debtor's joint interest in property that is owned as tenants by the entirety if (i) partition in kind would be impracticable; (ii)the sale of the undivided interest would realize significantly less than a sale free and clear of the interest of co-owners; (iii) the benefit of the estate of the sale outweighs the detriment to the co-owner; and (iv) such property is not used in the production, transmission, or distribution, for sale of electric energy or of gas for heat light or power. Mrs. Flanagan would oppose any effort to sell her interest in Castle Shores or Basel Street on the basis that the detriment to her would outweigh the benefit to the estate. If Mrs. Flanagan prevailed in her opposition, then the Debtor estimates that little to nothing would be available to general unsecured creditors.

Under this Plan, general unsecured creditors will receive no less than $212,207.77 or approximately 22% of asserted claims. However, in the event the Debtor's Objection to the VentureSpire Claim is sustained and is allowed as requested in the amount of $187,684, then general unsecured creditors will receive approximately 100% of their Allowed Claims. In the event VentureSpire's claim is allowed in an amount greater than $187,684, then the Debtor shall dedicate such additional portion of his disposable income as is necessary to pay such claims, or 100% of his total disposable income, whichever is greater. Under either scenario, the payments proposed under this Plan are significantly more than what unsecured creditors could expect to receive if the Debtor were liquidated in Chapter 7.

## ARTICLE 7
## GENERAL PROVISIONS

**7.1 Retention of Jurisdiction.** The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues relating to objections to Disputed Claims and issues arising from the assumption or rejection of executory contracts or unexpired leases; and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer actions.

**7.2 Title to Assets.** If the Plan is confirmed under § 1191(a), except as otherwise

provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Creditors, except as provided for under this Plan.

If the Plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case, but before the case is closed, dismissed or converted to a case under Chapter 7, whichever occurs first, Except as provided in § 1185 of the Bankruptcy Code, the Plan or the Confirmation Order, the Debtor shall remain in possession of all property of the estate.

**7.3 Binding Effect.** If the Plan is confirmed, the provisions of the Plan will bind the Debtor, and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**7.4 Severability.** If, following confirmation, any provision of this Plan is determined by any court of competent jurisdiction to be unenforceable, then such determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**7.5 Modification of Plan.** The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items, including revoting on the Plan prior to confirmation.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**7.6 Final Decree.** Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court

may enter such final decree on its own motion.

**7.7 Captions**. The caption headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

**7.8 Notices**. All notices of other communications required to be given or permitted under this Plan shall be in writing and delivered by first-class mail, postage prepaid, and/or, electronically, as follows:

To the Debtor:

Donald B. Flanagan, Jr.
16 Shasta Drive
North Reading, Massachusetts

With a copy to:

Marques C. Lipton
Lipton Law Group, LLC
945 Concord Street
Framingham, MA 01701
marques@liptonlg.com

## ARTICLE 8
## DEFINITIONS

**8.1** The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. Any of the following terms which are also defined by the Code are for convenience of reference only and are superseded by the definitions found in the Code.

**8.2 Administrative Claimant:** Any person entitled to payment of an Administrative Expense.

**8.3. Administrative Expense:** Any cost or expense of administration of the Chapter 11 case entitled to priority under § 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including, without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor, allowances of compensation or reimbursement of professional fees and expenses to the extent allowed by the Bankruptcy Court and any fees charged or assessed against the estate under 28 U.S.C. § 123.

**8.4 Assets:** All property that is property of the Debtor under §§ 541 and 1115 of the Bankruptcy Code, whether such property is now existing or hereafter arising or acquired.

**8.5 Bankruptcy Code or Code:** The Bankruptcy Reform Act of 1978, as amended and codified as 11 U.S.C. §§ 101-1532).

18

**8.6 Bankruptcy Court:** The United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

**8.7 Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**8.8 Bar Date**: June 14, 2021, the deadline established by the Bankruptcy Court for non-governmental creditors to file proof of claim.

**8.9 Class:** A category of claims or interest holders which are substantially similar to the other claims or interests in such class.

**8.10 Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**8.11 Confirmation Date:** The date upon which the Bankruptcy Court enters the Confirmation Order; provided however, that if the Confirmation Order is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**8.12: Confirmation Order:** An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

**8.13: Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed.

**8.14    Effective Date:**  The date that is 30 days after the Confirmation Date.

**8.15    Executory Contract:** Any contract under which unperformed obligations remain on both sides, or where both parties have continuing obligations to perform.

**8.16    Petition Date:** April 5, 2021, the date the Debtor filed the Chapter 11 petition for relief.

**8.17    Priority Claim:** Any claim entitled to priority in payment under Section 507(a) of the Bankruptcy Code.

**8.18    Priority Tax Claim:**  Any claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**8.19    Secured Claim**: Any claim secured by property of the Debtor's bankruptcy estate to the extent allowed under § 506 of the Code.

**8.20    Secured Creditor:**  Any holder of a secured claim.

**8.21 Subchapter V Trustee.**  Stephen S. Gray, the trustee appointed in this case pursuant to § 1183 of the Bankruptcy Code.

**8.22. Substantial Consummation:**  Shall have the meaning assigned to such term in § 1101(2) of the Bankruptcy Code.

**8.23. Unsecured Claim:**  A Claim that is (a) not an unclassified claim; (b) not secured by a valid lien on assets which is not void or avoidable under any state or federal law, including any provision of the Bankruptcy Code and (c) not classified as an equity interest.  Unsecured claims shall include any

deficiency Claim relating to any secured claim.

    8.24 **Unsecured Creditor:** Any holder of an Unsecured Claim.

Respectfully submitted,

By the debtor:

_____
Donald B. Flanagan, Jr.

And his counsel:

/s/ Marques C. Lipton
Marques C. Lipton, BBO #676087
Lipton Law Group, LLC
945 Concord Street
Framingham, MA 01701
(508) 202-0681
marques@liptonlg.com

By the Plan Sponsors:

_____
Jan R. Flanagan

_____
Brandon D. Flanagan

_____
In Force Technology, Inc.
by its president, Brandon D. Flanagan

Dated: July 6, 2021